UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHARLOTTE T. BODDIE, | : | |
|     Plaintiff | : | NO.: 1:09-CV-00377 |
| | : | |
| v. | : | (JUDGE CONNER) |
| | : | (MAGISTRATE JUDGE PRINCE) |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA, DEPARTMENT | : | |
| OF GENERAL SERVICES, OFFICE | : | |
| OF ADMINISTRATION, JAMES P. | : | |
| CREEDON, CONNIE TENNIS, and | : | |
| DEB SHANK, | : | |
|     Defendants | : | |

## REPORT AND RECOMMENDATION

Pursuant to an Order entered on August 4, 2010 (Doc. 34), Honorable Christopher Conner referred defendant's pending motion for summary judgment (Doc. 21) to the undersigned Magistrate Judge.

**I. Background**

This case involves several claims by plaintiff Charlotte Boddie against her ex-employer, defendant Department of General Services (DGS), as well as the several other named individual and governmental entities, arising out of the manner in which Boddie's employment with DGS was terminated.

*(A) Facts of the case*

The facts presented here are not in dispute, being taken only from those parts of defendants' statement of facts to which plaintiff has admitted.

Boddie began working for DGS as a security guard in June 2000, and was promoted to Capitol Police Officer (Patrolman) on November 25, 2000. (Doc. 23, ¶ 2.) Among the duties of a Patrolman, as Boddie knew, were exercising the power of arrest; providing property protection; walking for a long period of time; tactfully handling emergency situations; administering first aid and CPR; and providing police services. (*Id.* ¶ 4.) DGS rotates its officers through different assignments to ensure that they are familiar with each of their duties and do not forget their training, as well as to keep the officers "from becoming complacent" and to prepare the officers for the possibility of reassignment in emergency or extraordinary circumstances. (*Id.* ¶ 11.)

In February 2006, Boddie was diagnosed with a blood-clotting disorder and an enlarged uterus. (*Id.* ¶ 24.) She had corrective surgery, which her medical provider estimated would require four to six weeks of recovery. (*Id.* ¶ 26.) Gregory Green, then the Director of the Bureau of Human Resources, approved Boddie's request for sick leave from April 3, 2006 to October 3, 2006. (*Id.* ¶ 25.)

In October 2006, Boddie gave DGS documentation from her medical provider indicating that she would require light-duty work for a year. (*Id.* ¶ 27.) According to these documents, Boddie could not walk more than a quarter of a mile; could not stand for more than twenty minutes in an hour; could not climb more than four stairs per shift; and could not direct traffic, perform crowd control, or respond to emergency situations. (*Id.*)

DGS had a light-duty policy for the Capitol Police that made accommodations for an ill or injured officer. As it existed in October 2006, the light-duty policy had been in effect since April 2005. (*Id.* ¶ 13.) The policy allowed a qualified officer to go on temporary light-duty status if a temporary medical condition, substantiated by a note from the officer's health-care provider, would prevent the officer from performing all of the functions and duties of his or her position. (*Id.* ¶¶ 15, 20.) Light-duty status was not a permanent position; it was a temporary measure to allow the officer time to recover from

an injury or ailment. (*Id.* ¶ 16.) The Capitol Police lacked the manpower to permit officers to remain on light-duty status indefinitely, and no Patrolman had been permanently assigned to light-duty status since Richard Shaffer became Superintendent of the Capitol Police in January 2004. (*Id.* ¶ 17.)

While on light-duty status, a Patrolman received a full salary and benefits, worked in the communications room, and was prohibited from responding to emergencies. (*Id.* ¶¶ 15, 18, 19.) When a Patrolman regained the capability to return to full duty, the officer was required to give a substantiating medical note to his or her commanding officer, which would then be reviewed by the Capitol Police to ensure that the officer was physically capable of meeting the demands of full-duty status. (*Id.* ¶ 22.) The Capitol Police coordinated with the Bureau of Human Resources in making the decision to put officers on light-duty status, but the Bureau had no involvement in particular assignments for officers; those decisions were the province of Superintendent of Capitol Police Shaffer and his staff. (*Id.* ¶ 23.)

Beginning on October 3, 2006, Boddie was placed on light-duty status and returned to the regular payroll at DGS. (*Id.* ¶ 28.) A clerical oversight prevented her from physically returning to work until November 3, but she was paid from October 3 forward. (*Id.*) While on light-duty status, Boddie worked in the communications room in civilian clothing and was not subject to normal assignment rotation or emergency-response duty. (*Id.*) She worked there for roughly a year, from October 3, 2006, to October 19, 2007. (*Id.* ¶ 31.)

Meanwhile, in March 2007, Connie Tennis became the Director of the Bureau of Human Resources. (*Id.* ¶ 42.) On September 5, 2007, Tennis sent Boddie a letter requesting an updated medical certification. (*Id.* ¶ 43.) In response, Tennis received a letter from Denise Beltowski, PAC, on September 19, 2007, concerning Boddie's work restrictions. (*Id.* ¶ 44.) According to that letter, Boddie had "permanent disabling medical conditions," which prevented her from standing more than twenty minutes each hour;

3

from sitting more than two hours at a stretch without a break for ambulation; from walking more than one hundred feet without resting for fifteen to twenty minutes before resuming; from being exposed to extreme weather conditions; and from directing traffic, performing crowd control, or walking for long periods of time. (*Id.* ¶¶ 44–45.) Tennis discussed this letter with Superintendent Shaffer, and it was concluded that Boddie could not perform the essential job functions and duties of a full-duty Patrolman. (*Id.* ¶ 46.)

On September 28, 2007, Tennis sent Boddie a second letter, reminding her that light-duty status is only a temporary option, which would end on October 19, 2007. (*Id.* ¶ 48.) The letter offered Boddie five options: take paid or unpaid leave; apply for disability retirement; apply for regular retirement; apply for other positions for which she was qualified; or resign. (*Id.*) Tennis invited Boddie to contact her about these options if she had any questions. (*Id.*)

Tennis received another letter from Beltowski on October 16, 2007, which contained a revised list of work restrictions for Boddie. (*Id.* ¶ 49.) According to that letter, Boddie could not climb more than four stairs per shift; could not stand for more than twenty minutes each hour; could not sit for more than two hours at a time; could not walk more than one hundred feet without resting; could not be exposed to extreme weather; and could not direct traffic, perform crowd control, walk for long periods of time, or operate a car for more than two hours. (*Id.* ¶ 50.) Tennis responded to Boddie that same day in an email, acknowledging the letter but indicating that continuing light-duty status was not an option. (*Id.* ¶ 53.) She asked Boddie which of the five options in her letter of September 28 she was interested in pursuing. (*Id.*) Boddie sent back two emails asking whether she could be assigned to certain Patrolman worked assignments, but did not discuss any of the options listed in Tennis's September 28 letter. (*Id.* ¶ 54.)

Around this time, Tennis began working with Deb Shank, the Sick, Parental, and Family Care (SPF) Absence Coordinator, to ensure that Boddie received her entitled leave. (*Id.* ¶ 56.) On October 19, 2007, Boddie's light-duty status ended and she took SPF

4

leave through May 15, 2008. (*Id.* ¶ 57.) On January 7, 2008, Shank sent Boddie a letter approving SPF leave from November 15, 2007 to February 15, 2008. (*Id.* ¶ 62.) The leave was approved as sick leave without pay with benefits under the Family Medical Leave Act (FMLA). (*Id.*) Shank sent Boddie a letter on March 3, 2008 that extended her SPF leave from February 18 to May 15. (*Id.* ¶ 63.)

On March 17, 2008, Tennis sent Boddie a third letter, asking Boddie to contact her about other job opportunities for which she might have been qualified. (*Id.* ¶ 64.) Boddie did not reply or otherwise attempt to contact Tennis. (*Id.*) On April 4, Tennis sent Boddie a fourth letter, reminding her that her SPF leave would expire on May 15 and asking Boddie to contact her about other job opportunities. (*Id.* ¶ 65.) Boddie still did not respond or otherwise contact Tennis. (*Id.*) On April 28, Tennis sent Boddie a fifth letter reiterating the same; again, Boddie did not respond or contact Tennis. (*Id.* ¶ 66.)

On June 3, 2008, Shank sent Boddie a letter approving her for Extended SPF (ESPF) leave from May 15 to November 13, 2008. (*Id.* ¶ 67.) On November 6, Shank sent Boddie a letter reminding her that her ESPF leave was set to expire on November 13. (*Id.* ¶ 70.) Shank's letter told Boddie of the options available to all employees on ESPF: namely, Boddie could return to full-time, full-duty work with a medical release from her health care-provider or she could resign. (*Id.*) The letter also told Boddie that if she did not choose an option before November 13, her employment could be terminated. (*Id.*)

Boddie's leave ended on November 13. (*Id.* ¶ 71.) That same day, Shank received a letter from Boddie stating that Boddie could return to work with the restrictions that Beltowski had already provided on her behalf. (*Id.* ¶ 72.) The letter did not indicate that Boddie could return to full-duty work and did not contain a medical release from her health-care provider. (*Id.* ¶ 73.) Boddie never asked to be transferred to another position within DGS; the only accommodation she sought was to stay permanently on light-duty status as a Patrolman. (*Id.* ¶ 75.)

5

Shank had no authority to make decisions about Capitol Police assignments or light-duty status of its officers, nor did she have the authority to remove a Patrolman from his or her position. (*Id.* ¶ 73.) On November 14, Boddie was administratively removed from her position as Patrolman, of which Tennis advised her by a letter dated November 17, 2008. (*Id.* ¶ 74.)

Defendant James Creedon was the Secretary for the Pennsylvania Department of General Services, a position that he had held since July 6, 2005. (*Id.* ¶ 76.) He did not make and had never personally made employment decisions regarding individual Patrolmen within the Capitol Police force. (*Id.* ¶ 77.) Creedon delegated those responsibilities to the Superintendent of the Capitol Police and the Director of the Bureau of Human Resources. (*Id.*) He had no personal involvement with the decision to administratively remove Boddie from her position as Patrolman, and prior to the institution of this action, was unaware of Boddie, her health condition, or her employment status with the Capitol Police. (*Id.* ¶¶ 78–79.)

Another officer with the Capitol Police, Keith Wagner, is a Caucasian man who suffered from a non-work-related medical condition and was allowed to work on light-duty status for about a year. (*Id.* ¶¶ 80–81.) Near the end of his light-duty period, Tennis sent him letters informing that the light-duty status was about to end and outlining his options. (*Id.* ¶ 81.) Wagner provided Tennis with a note from his medical provider clearing him for full duty, and so he did return to full duty. (*Id.* ¶ 82.) Boddie was permitted to work on light-duty status for as much time as Wagner was. (*Id.* ¶ 83.)

*(B) Procedural history*

Plaintiff instituted this action by filing a complaint (Doc. 1) on March 1, 2009. Defendants answered on July 14. (Doc. 5.) After unsuccessful mediation (Docs. 14, 15, 17), defendants filed a motion for summary judgment (Doc. 21) on May 25, 2010, along

with a statement of facts (Doc. 23), supporting exhibits (Doc. 22), and a brief in support (Doc. 24). Plaintiff responded with a brief in opposition (Doc. 30) on June 19 and a response to defendants' statement of facts (Doc. 32) on June 27. Once defendants had filed their reply brief (Doc. 33) on July 7, the motion for summary judgment was ripe for adjudication.

**II. Standard of Review**

Federal Rule of Civil Procedure 56(c) requires the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1287–88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, the nonmoving party may not rest on the

7

unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56(c) of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56(e) to go beyond the pleadings with affidavits, depositions, answers to interrogatories, or the like in order to demonstrate specific material facts that give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). When Rule 56(e) shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323; *see Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

**III. Discussion**

The complaint contains two counts. Count I claims against the Commonwealth of Pennsylvania (Commonwealth), the Office of Administration (OA), and DGS under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-1 to 2000e-17, and the Pennsylvania Human Relations Act (PHRA), 43 Pa. Cons. Stat. §§ 951–963. Count II claims against the individual defendants, James Creedon, Connie Tennis, and Deb Shank, under the Fourteenth Amendment; Title I of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101–12300; Rehabilitation Act of 1973 § 503, 29 U.S.C. § 793; and the PHRA. The claims under each of the laws will be addressed in turn.

*(A) Rehabilitation Act section 503*

It has been the law in the Third Circuit for nearly thirty years that section 503 creates no private right of action. *Beam v. Sun Shipbuilding & Dry Dock Co.*, 679 F.2d 1077, 1078 (3d Cir. 1982) (citing, *e.g.*, *Davis v. United Airlines*, 662 F.2d (2d Cir. 1981); *Fisher v. Tucson*, 663 F.2d 861 (9th Cir. 1981); *Simon v. St. Louis County*, 656 F.2d 316 (8th Cir. 1981)). Plaintiff's section 503 claim may be summarily dismissed.

*(B) Title I of the Americans with Disabilities Act*

Defendants argue in their brief supporting summary judgment that Title I of the ADA does not provide a right of recovery against individuals. *See Wardlaw v. City of Phila. Street's Dep't*, 378 Fed. Appx. 222, 225 (3d Cir. 2010) (citing *Koslow v. Pennsylvania*, 302 F.3d 161, 178 (3d Cir. 2002) ("[T]here appears to be no individual liability for damages under Title I of the ADA . . . .")); *Zimmerman v. Biehler*, No. 08-0538, 2009 WL 4793746, at *4 (M.D. Pa. Dec. 8, 2009) (Conner, J.) (citing *McQuaid v. Acts Ret. Cmtys. Southampton Estates*, No. 04-3620, 2005 WL 2989642, at *2 (E.D. Pa. Aug. 8, 2005); *McInerney v. Moyer Lumber & Hardware, Inc.*, 244 F. Supp. 2d 393, 398 (E.D. Pa. 2002); *Douris v. Schweiker*, 229 F. Supp. 2d 391, 397 (E.D. Pa. 2002)) ("[T]here is no liability under the ADA against individuals who do not otherwise qualify as an entity covered by the ADA (e.g., an 'employer').")

Plaintiff makes no attempt to refute defendants' argument. Since plaintiff has claimed only against the individual defendants Creedon, Tennis, and Shank,[1] plaintiff's claim is subject to summary dismissal.

### (C) Title VII

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Supreme Court articulated a burden-shifting scheme for claims of disparate treatment, which is applied in the Third Circuit. First, the plaintiff bears the burden of establishing a prima facie case. If the plaintiff does, a presumption of discrimination arises, which the defendant may rebut with evidence of a legitimate nondiscriminatory reason for the adverse employment action. Successful rebuttal shifts the burden back to the plaintiff to show that those nondiscriminatory reasons were in fact a pretext for discriminatory action.

---

[1] Both parties briefed the issue of Title I of the ADA as it applies to the Commonwealth and its agencies. However, the complaint neither states nor attempts to state a claim under the ADA against anyone but Creedon, Tennis, and Shank. (*See* Doc. 1, at ¶¶ 20–24 (claiming against the Commonwealth, DGS, and OA under Title VII and the PHRA); *id.* at ¶¶ 26–30 (claiming against Creedon, Tennis, and Shank under, *inter alia*, the ADA)). In any event, had the complaint claimed against the Commonwealth and its agencies under the ADA, these defendants would be entitled to summary judgment in their favor because they enjoy sovereign immunity. *Board of Trustees v. Garrett*, 531 U.S. 356, 360 (U.S. 2001); 1 Pa. Cons. Stat. § 2310; 42 Pa. Cons. Stat. § 8521.

(1) Prima facie case

The plaintiff's prima facie case requires a showing by a preponderance of the evidence that: (1) the plaintiff belongs to a protected class; (2) the plaintiff was qualified for the position; (3) the plaintiff was subject to an adverse employment action despite being qualified; and (4) the adverse employment action was under circumstances raising an inference of discriminatory action, while the employer continued to seek persons with similar qualifications for the position. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 802); *id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)). The burden of production to make this showing is "not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). The prima facie case is meant to be flexible and tailored to the specific context of each case. *Id.* at 253 n.6 (quoting *McDonnell Douglas*, 411 U.S. at 802). If the plaintiff establishes a prima facie case, a presumption of discriminatory action arises; it is presumed that, without further explanation from the defendant, the adverse employment action was "more likely than not based on the consideration of impermissible factors." *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 n.44 (1977)).

In this case, defendants concede that plaintiff can show that she is a member of a protected class and was subject to an adverse employment action in the form of administrative removal. They contend, however, that plaintiff was not qualified for the position of Patrolman and that the circumstances of her administrative removal gave rise to no inference of discriminatory action. Plaintiff counters by insisting that she provided information showing that she was capable of performing a Patrolman's essential job functions. Her argument for an inference of racial discrimination consists of repeating her insistence that she showed that she was qualified for the job. (*See* Doc. 29, at 10 ("[S]ince [plaintiff] sufficiently provided information supporting a claim that [she] can perform the

11

essential job functions set forth in the position description, [she] can present a prima facie case of racial discrimination.").)

(a) Whether plaintiff was qualified for the position

In making her case that she was qualified to work as a Patrolman, plaintiff bears the burden of proving that she can perform the essential functions of a position. *Supinski v. United Parcel Serv., Inc.*, No. 06-0793, 2010 WL 569842, at *8 (M.D. Pa. Feb. 11, 2010) (discussing qualification for a job in the context of the ADA). "Written job descriptions, the employee's experience, and the employer's description of essential functions are to be considered." *Id.* (citing *Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 326 (3d Cir. 2003)). Functions are considered "essential" to one's job only if they are "fundamental" and "not simply 'marginal.'" *Conneen*, 334 F.3d at 326 (citing *Skerski v. Time Warner Cable Co.*, 257 F.3d 273 (3d Cir. 2001)) (discussing the ADA). The question is whether plaintiff is "*capable* of performing certain fundamental job functions, not whether [she has] in fact been required to do so." *McGovern v. MVM, Inc.*, 545 F. Supp. 2d 468, 476 (E.D. Pa. 2008) (quoting *Allen v. Hamm*, No. 05-879, 2006 WL 436054, at *8 (D. Md. Feb. 22, 2006)) (discussing the ADA).

Plaintiff claims that her medical provider "made a methodical determination that she could perform the essential functions of her job" (Doc. 29, at 8), and exhorts the Court to consider the section of the Patrolman job descriptions entitled "Essential Functions" as the exhaustive standard of what are, in fact, the fundamental job functions of a Patrolman. (*See* Doc. 30-9, at 3 (listing ten "Essential Functions" of a Patrolman)). But plaintiff stretches the facts too far. First, the opening line of the letter from Denise Beltowski, PAC, states that plaintiff should remain on light duty, which is incompatible with the notion of returning to full duty. (Doc. 30-8, at 2.) Second, Beltowski provided not a "methodical determination" but rather a terse list of plaintiff's abilities and

limitations. (*Id.*) Third, true as it is that Beltowski's letter explicitly states, albeit in the briefest of language, that plaintiff could perform nine of the ten listed essential functions, the letter also explicitly states that plaintiff cannot "walk for extended periods of time," even though the sixth of the ten listed essential functions is "walks for long periods of time." Even if plaintiff is correct to argue that the only fundamental job functions of a Patrolman are the ten functions designated "essential" on the position description, the letter from plaintiff's medical provider conclusively establishes that plaintiff was not, in fact, able to perform all essential functions of the job.[2]

Beltowski's letter contained half a dozen other restrictions on plaintiff's physical activity. According to the letter, plaintiff should not climb more than four stairs per eight-hour shift; should not stand more than twenty minutes per hour; should not sit more than two hours at a time, and should have some time to walk between sitting sessions; should not walk more than one hundred feet without resting for fifteen to twenty minutes before resuming; should not be exposed to extreme weather conditions; must not operate a motor vehicle for more than two hours at a stretch; and cannot direct traffic or perform crowd control. (*Id.*) These limitations would prevent plaintiff from performing several functions that can accurately be considered essential to the job. For one, plaintiff cannot direct traffic, which is listed twice in the position description, as the first listed item in both the section entitled "Description of Duties" and the section entitled "Decision Making." Plaintiff also admits that prior to going on light-duty status, she was regularly rotated

---

[2]Plaintiff attempts to argue that this sixth requirement, that a Patrolman must be able to walk for "long periods," is somehow meaningless because the term "long" is not defined. This argument is unconvincing. Just as terms in statutes are accorded their plain meaning whenever possible, so will the terms in the Patrolman position description. A Patrolman must be able to walk for "long periods," but plaintiff's medical provider stated that plaintiff cannot walk for "extended periods." In plain English, the terms "long" and "extended" are equivalent, and Beltowski stated that plaintiff cannot do something that her job would have required her to do.

13

through different assignments, including directing traffic. For another, she cannot conduct crowd control; "crowd control" is listed in "Description of Duties" and, along with "directs traffic, "crowd control" is listed first in "Decision Making."

Plaintiff's inability to perform several of the essential functions of a Patrolman unequivocally establishes that she was, at the time that she was removed from her position, unqualified to be a Patrolman.

(b) Inference of racial discrimination

As stated above, plaintiff's argument that her termination gives rise to an inference of racial discrimination consists of restating her insistence that she established that she was qualified for the job. Not only is this an insufficient argument by itself, but as shown in the preceding paragraphs, plaintiff was not qualified for the job.

Defendants have also introduced positive evidence to establish that there was only one similarly situated employee who was treated in a fashion identical to plaintiff until their situations diverged. Officer Keith Wagner, a Caucasian man, was put on light duty in the communications room for a year as a result of a non-work-related medical condition. After the year had nearly elapsed, Wagner, like Boddie, received a letter from Tennis outlining his options, including applying for disability retirement, applying for regular retirement, applying for another position, or resigning. Up until this point Wagner's situation was the same as plaintiff's in all relevant respects. But then, unlike plaintiff, Wagner provided Tennis with a note from his medical provider clearing him for full duty. Only as this point did their situations diverge, and plaintiff can hardly say that she suffered racial discrimination because Wagner, who was cleared for full duty, returned to work, while she, not cleared for full duty, did not return to work.

(2) Legitimate nondiscriminatory reasons for termination

If the plaintiff has successfully made out a prima facie case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). The defendant must "clearly set forth, through the introduction of admissible evidence, reasons for its action which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *Id.* at 799 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)) (internal quotation marks omitted). If the defendant meets this burden, the presumption of discrimination is rebutted. *Id.* at 797 (citing *Tex. Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981)).

In this case, even though plaintiff failed to make out a prima facie case, defendants would be able to show legitimate nondiscriminatory reasons for plaintiff's termination. After remaining on light-duty status for a year, plaintiff remained physically incapable of performing all the duties of a Patrolman. Her medical provider issued a letter that explicitly stated that plaintiff should remain on light duty, even though there was no such thing as a permanent light-duty position. Not only did no permanent light-duty position exist, but DGS lacked the resources to permit officers to remain on light-duty status indefinitely.

(3) Conclusion

Because plaintiff cannot establish a prima facie case of discrimination under Title VII, and even if she could, defendants could show legitimate nondiscriminatory reasons for her termination, it is recommended that summary judgment be granted for defendants on plaintiff's Title VII claim.

## (D) PHRA

Because "[c]laims under the PHRA are interpreted coextensively with Title VII claims," plaintiff's inability to maintain her Title VII claims against the Commonwealth, the DGS, and the OA necessitates a recommendation that her PHRA claims against them be dismissed as well. *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 179 (3d Cir. 2009) (quoting *Atkinson v. LaFayette College*, 460 F.3d 447, 454 n.6 (3d Cir. 2006)) (alteration in original).

Plaintiff also claims against Creedon, Tennis, and Shank. Although individuals may not be held liable under Title VII, *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1077 (3d Cir. 1996) (citing, *e.g.*, *Williams v. Banning*, 72 F.3d 552 (7th Cir. 1995)), there are at least some instances in which Pennsylvania state courts have held that individuals may be held liable under the PHRA, *e.g.*, *Santarelli v. Nat'l Book Co.*, 41 Pa. D. & C.4th 483, 492 (Pa. Com. Pl. 1999) (holding that section 955(e) of the PHRA "is designed to hold individuals liable").

The complaint and related briefing do not specify any particular section of the PHRA under which plaintiff claims against the individual defendants. Section 955(e) is the section closest to being applicable to the present case,[3] which states:

> [It shall be an unlawful discriminatory practice for] any person, employer, . . . or employe, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, . . . or to attempt, directly or indirectly, to commit any act declared by this section to be an unlawful discriminatory practice.

43 Pa. Cons. Stat. § 955(e). Successfully making a claim under § 955(e) requires the plaintiff to produce evidence that at least one individual defendant "aided, abetted, incited, compelled or coerced" another individual to discriminate against the plaintiff.

---

[3]The other provisions of section 955 concern, for example, conduct of employers, § 955(a), (b); conduct of labor organizations, § 955(c); and retaliation for opposition to "practice[s] forbidden by [the PHRA]," § 955(d). Section 955(e) is the closest to relevant of all the PHRA provisions prohibiting discrimination.

*Santarelli*, 41 Pa. D. & C.4th at 491–92 (citing *Cohen v. Temple Physicians, Inc.*, 11 F. Supp. 2d 733, 737 (E.D. Pa. 1998)). There being no such evidence here, it is recommended that summary judgment be granted for defendants on the PHRA claims.

*(E) Section 1983 and Equal Protection*

A § 1983 claim requires the same elements of proof as a Title VII action. *Lewis v. Univ. of Pittsburgh*, 725 F.2d 910, 915 n.5 (3d Cir. 1983) (citing, *e.g.*, *Gray v. Bd. of Higher Educ.*, 692 F.2d 901, 905 (2d Cir. 1982)). A plaintiff must prove "purposeful discrimination," meaning that she received "treatment different from that received by similarly situated individuals." *Ackah v. Dep't of Corrections*, No. 08-0376, 2009 WL 2951986, at *6 (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990)). Persons are "similarly situated" when they are "alike 'in all relevant respects.'" *Startzell v. City of Philadelphia*, 533 F.3d 183, 203 (3d Cir. 2008) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). A plaintiff claiming an Equal Protection violation "must show intentional discrimination against her *because of her membership in a particular class, not merely that she was treated unfairly as an individual*." *Handley v. Phillips*, 715 F. Supp. 657, 673 (M.D. Pa. 1989) (citing *Heubschen v. Dep't of Health*, 716 F.2d 1167, 1171 (7th Cir. 1983)).

Plaintiff makes her Equal Protection claim against the individual defendants Creedon, Tennis, and Shank. "A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of respondeat superior. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)) (alteration in original).

17

Under the *Rode* standard, neither Creedon nor Shank could possibly be held liable. Plaintiff admitted that Creedon had no personal involvement in the decision to administratively remove Boddie from her position as Patrolman, and prior to being named a defendant in this action, was unaware of Boddie, her health conditions, or her employment status with DGS. Plaintiff also admitted that Shank lacked the authority to make decisions regarding assignments of a Patrolman or to remove a Patrolman from his or her position. Because Creedon and Shank neither personally directed employment decisions regarding plaintiff nor had actual knowledge of and acquiescenced to such employment decisions, neither Creedon nor Shank can be liable under § 1983.

Plaintiff argues that Tennis "was the point person and a key figure involved in the decision to ignore the evidence that Boddie could perform the essential job functions" of a Patrolman. (Doc. 29, at 13.) The evidence of record does not support this contention. To the contrary, as discussed in Part III.C.1.a above, the letter that plaintiff's own medical provider submitted to DGS stated that plaintiff should be kept on "light duty," despite the nonexistence of a permanent light-duty position, and that plaintiff could not walk for "extended periods" of time, despite the Patrolman position requiring the ability to walk for "long periods." The evidence fails to establish that plaintiff could perform the essential functions of a Patrolman. Further, plaintiff admitted that she never asked to be transferred to another position within DGS; the closest thing to a "reasonable accommodation" for which she asked was to permanently stay on light-duty status, although this was not an available option. Indeed, Tennis sent plaintiff five letters between September 5, 2007, and April 28, 2008, attempting to find a suitable alternative placement for plaintiff within DGS, but plaintiff never expressed interest in alternative placements, instead asking only to be returned to a limited form of duty as a Patrolman. Nothing about Tennis's conduct toward plaintiff suggests treatment that was discriminatory on the basis of her membership in a protected class.

It is therefore recommended that summary judgment be granted for defendants on plaintiff's § 1983 claim.

## IV. Conclusion

Based on the foregoing discussion, it is recommended that defendant's motion for summary judgment be GRANTED, and plaintiff's complaint be dismissed in full.

s/ William T. Prince<br>
William T. Prince<br>
United States Magistrate Judge

October 25, 2010